## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

ERNESTINE YAZZIE AS WRONGFUL DEATH PERSONAL
REPRESENTATIVE OF CARLOS THOMAS YAZZIE,
DECEASED,

          Plaintiff,

vs.                                                      CIVIL NO. CIV 19-518 JB/KK

UNITED STATES OF AMERICA,

          Defendant.

### PLAINTIFF'S EXPERT DISCLOSURE

COMES NOW plaintiff, by and through her attorneys of record, Barber & Borg, LLC

(Forrest G. Buffington), and hereby submit the following expert witness disclosure to defendant

pursuant to Rule 26(a)(2)(B), Federal Rules of Civil Procedure.

**Retained Expert:**

1.  Cameron Lindsay
    Cameron Lindsay Consulting Services
    1313 Jacobs
    Morgantown, WV 26505
    267.252.4965

Mr. Lindsay will be called upon to testify to established standards, and violation by the

Navajo Nation, of standard and accepted practices of detention facilities, concerning the

admission, screening, and observation of intoxicated detainees and any others set forth in his

report. Mr. Lindsay's Curriculum Vitae, Fee Schedule and Expert Report are attached as Exhibits

A, B, and C respectively.

**Non-Retained Experts:**

1.  William H. Anderson, Ph.D., F-ABFT
    Forensic Toxicologist
    NMS Labs
    3701 Welsh Road

Exhibit A

Willow Grove, PA  19090
215.657.4900

William H. Anderson is expected to testify regarding toxicology and his toxicology report of Decedent dated January 26, 2017.

2. Ian Paul, MD
Director of the Pathology Residency training program and the Forensic Pathology Fellowship training program., Associate Professor of Pathology
Office of the Medical Investigator
1101 Camino de Salud
Albuquerque, NM  87102
505.272.3053

Ian Paul, MD will testify as to the cause and manner of death.

Respectfully Submitted,
BARBER & BORG, LLC

__/s/ Forrest G. Buffington_____
Forrest G. Buffington
PO Box 30745
Albuquerque, NM  87190
505.884.0004
forrest@barberborg.com
*Attorney for Plaintiffs*

**Cameron K. Lindsay**
**Cameron Lindsay Consulting Services, LLC**
**1313 Jacobs Drive**
**Morgantown, WV 26505**
**Cell: 267-252-4965**
clindsay50@yahoo.com
**cklindsay.com**

## PROFESSIONAL EXPERIENCE:

**Expert Witness (2014-present)**
I am retained by attorneys representing plaintiffs or defendants in matters of prison/jail civil and criminal litigation. I have conducted work on a contractual basis for various State Attorneys General, as well as a multitude of individual law firms. In this capacity I develop expert written opinions, and provide testimony at deposition and/or trial.  I have been retained in the following matters; "P" or "D" represents whether I assisted the defendants or plaintiffs:

*Frost v. Arizona*, United States District Court for Arizona, CV2014-090418-AIU, (D-inmate homicide);

*Wright v. Arizona,* United States District Court for Arizona, CV2013-004966, (D-serious inmate on inmate assault);

*Taylor v. Maryland Department of Corrections, et.al,* United States District Court for Maryland, Case No. 16-CV-00336, (P-medical malpractice following inmate injury);

*Alexander v. Monroe County*, United States District Court for the Middle District of Pennsylvania, 3:13-CV-01758, (P-wrongful death of an inmate);

*Tarbox v. Butler Township*, United States District Court for the Middle District of Pennsylvania, 3:14-CV-1346, (P-wrongful imprisonment following criminal charges);

*Delaney v. The GEO Group*, District Court, 37th Judicial District of Bexar County, Texas, 2012-C106719, (P-inmate suicide);

*Doe v. The GEO Group*, United States District Court for the Western District of Texas, SA16CB173XR, (P-sexual assault of staff member on inmate);

*Hafer v. City of Trenton*, Mercer County, New Jersey Superior Court, MER-L-762-10, (D-inmate suicide);

*Ricky Combs v. Three Forks Jail*, Lee Circuit Court, Commonwealth of Kentucky, 15C100105, (P-wrongful death of an inmate);

*Simmons v. Three Forks Jail,* Lee Circuit Court, Commonwealth of Kentucky, 16C100080, (P-wrongful death of an inmate);

*Smith v. Three Forks Jail*, Lee Circuit Court, Commonwealth of Kentucky, 16C100101, (P-wrongful death of an inmate);

**EXHIBIT A**

*Wells v. Rockcastle County Jail*, United States District Court for the Eastern District of Kentucky, 6:16-CU-00077, (P-inmate suicide);

*Lacy v. Middlesex County*, United States District Court for Massachusetts, 14-CV-10097, (P-serious inmate on inmate assault);

*Lopez v. New York City Department of Corrections (Rikers Island)*, Queens County Court, New York, 24926-2011, (P-staff assault on inmate);

*Ruscher v. Arizona*, United States District Court for Arizona, 3:15-CV-08051, (D-inmate homicide);

*New Jersey v. Aman*, Cape Superior Court, New Jersey, 13001083, (D-criminal assault in the community);

*Forshey v. Huntingdon County,* United States District Court for the Middle District of Pennsylvania, 13-CV-00285, (P-conditions of confinement leading to serious inmate injury);

*White v. Pallito*, United States District Court for Vermont, 174-3-15 WNCV, (D-inmates serving state-imposed sentences in another state);

*Morgal v. Jacobs, et al*, United States District Court for Arizona, CV-12-280-TUC-CKJ, (D-staff assault on an inmate);

*Grimes v. The District of Columbia, et al,* United States District Court for The District of Columbia, 1:08-CV-02024 (P-inmate assault leading to death of juvenile inmate);

*Manigault v. Ohio Department of Rehabilitation and Corrections,* Court of Claims of Ohio, 2014-00962, (P-strip search of an inmate visitor);

*Smith v. The District of Columbia Department of Corrections*, United States District Court for the District of Columbia, 1:15-CV-00161-ABJ, (P-over detention/late release);

*Dunaway v. Crabtree, et al,* Powell County Circuit Court, Commonwealth of Kentucky, 17-CI-00098, (P-inmate on inmate sexual assault);

*Rowe v. Big Sandy Regional Detention Center*, Johnson County Circuit Court, Commonwealth of Kentucky, 17-CI-00244, (P-inmate on inmate assault with injury);

*Dickey v. Three Forks Jail,* Lee Circuit Court, Commonwealth of Kentucky, 17-CI-00011, (P-wrongful death of an inmate);

*The Estate of Kyle Combs v. Fulton County Detention* Center, Fulton County Circuit Court, Commonwealth of Kentucky, 17-CI-00002 (P-wrongful death of an inmate);

*Hensley v. Bossio, et al,* United States District Court for the Eastern District of Kentucky, 0:17-CV-00007-HRW, (P-inmate homicide);

*Gabriel Armendariz, et al, v. Santa Fe County Board of Commissioners*, United States District Court for the District of New Mexico, 1:17-cv-00339 (P-class action complaint, exposing inmates to toxic conditions);

*Ancio Robinson v. Board of Commissioners of Caddo County, Oklahoma, et al*; United States District Court for the Western District of Oklahoma, CIV-17-345-D (P-inmate homicide by staff);

*Paute v. Pulaski County, et al;* United States District Court for the Eastern District of Kentucky, civil action: 6:17-cv-00305-DCR (P-inmate serious injury by staff);

*Wright v. Trumbull County, et al;* United States District Court for the Northern District of Ohio, case number 4:17-CV-002383 (P-inmate death);

*Monica Allen v. Three Forks Jail*, Lee County Circuit Court, Commonwealth of Kentucky, 12-CI-00096 (P-serious inmate injury); and

*Collier v. State of Hawaii, et al.,* Circuit Court of the First Circuit, State of Hawaii, 17-1-0406-03-JHA (P-over detention/late release).

I was also retained by the Kentucky State Protection & Advocacy Services Division to provide an analysis and opinions relevant to the Kentucky Department of Corrections use of four and five-point restraints, and use of long-term isolation/segregation.

**Warden (2012-2014)**
**Delaware County Prison, Thornton, Pennsylvania**
In my capacity as warden of the Delaware County Prison---the only privatized county jail in Pennsylvania---I was ultimately responsible for the care, control, and custody of upwards of 2,000 inmates; and the hiring, training, supervision, direction, and safety of approximately 600 staff. "DELCO" serves mainly as a pretrial/presentence facility and functions more as a county jail than prison; therefore it detains/incarcerates prisoners of all security and custody levels, the majority of whom ultimately serve their sentences in a Pennsylvania State Department of Corrections facility.

**Warden (2009-2012)**
**Moshannon Valley Correctional Center, Philipsburg, Pennsylvania**
Subsequent to my retirement from federal service in October 2009, I was hired by Cornell Companies to serve in the private sector of corrections as the warden of the Moshannon Valley Correctional Center. MVCC is privately owned and operated, and contracts with the United States Department of Justice's Federal Bureau of Prisons to incarcerate illegal aliens who have been convicted of felonious crimes at the federal level. In 2010, Cornell Companies was acquired by The GEO Group, Inc., which continues to operate the facility on a contractual basis with the federal government. As part of MVCC's mission, it incarcerates approximately 1,800 low security level inmates, the vast majority of whom have "in" custody and, ultimately, will be deported to the countries of their origin. As warden, I was ultimately responsible for the care, custody, and control of all inmates; and the hiring, training, supervision, direction, and safety of approximately 180 staff.

**United States Department of Justice**
**Federal Bureau of Prisons 1989-2009:**

**Warden (2007-2009)**
**Metropolitan Detention Center, Brooklyn, New York**
As Warden of the Metropolitan Detention Center, Brooklyn, I was ultimately responsible for the care, custody, and control of upwards of 3,000 inmates; and the hiring, training, supervision, direction, and safety of approximately 500 staff. MDC Brooklyn is an

administrative facility---essentially a federal jail---and therefore incarcerates/detains pretrial/presentence inmates of all security and custody levels. As warden of the Metropolitan Detention Center, a component of the federal judiciary in the Eastern

District of New York, I interfaced with a multitude of federal magistrate judges, district judges, and many other court and law enforcement officials on a routine basis. As was the case in all of my positions as warden, I was ultimately responsible for the management of the facility's salary expenditures and operational budget ($50M), and maintenance of the entire physical plant.

**Warden (2004-2007)**
**United States Penitentiary, Canaan, Pennsylvania**
I was the first warden to be appointed to the brand new United States Penitentiary (USP), Canaan. Its mission is to incarcerate high security level inmates, with "in" and/or maximum custody. I was responsible for selecting a leadership team and the entire staff from the top down, and ensuring the infrastructure and activation of the facility were operational within designated time frames. I was ultimately responsible for the care, control, and custody of approximately 1,600 high security level inmates; as well as the hiring, training, supervision, direction, and safety of 350 staff. During my tenure at USP, Canaan, I was promoted to the federal government's Senior Executive Service (SES) by virtue of appointment from the United States Attorney General.

**Warden (2002-2004)**
**Federal Correctional Institution, Lompoc, California**
As warden of the Federal Correctional Institution, Lompoc, I was responsible for the care, custody, and control of approximately 1,500 low security level inmates, the vast majority of whom were designated with "in" custody; and approximately 200 additional inmates at the satellite Intensive Confinement Center. The ICC was the federal government's version of a "boot camp." All inmates assigned to the Intensive Confinement Center were designated as minimum security level, with community custody. I was also responsible for the hiring, training, supervision, direction, and safety of all 180 staff. During my tenure as warden at FCI, Lompoc, I simultaneously acted as the warden of the adjacent high security, United States Penitentiary, Lompoc, for approximately one month.

**Deputy Regional Director (2000-2002)**
**Northeast Regional Office; Philadelphia, Pennsylvania**
As deputy regional director for the bureau's Northeast Regional Office, I was responsible for assisting in the supervision of, and serving as a conduit of communication between, 19 wardens of correctional facilities throughout the region, and the regional director. I served as the on-site direct supervisor of 18 regional administrators, and was ultimately responsible for the supervision of approximately 80 support staff. In the absence of the regional director, I served as his actor. Also during my tenure as the DRD, I acted as warden at three of our region's facilities in emergency situations.

**Associate Warden (1999-2000)**
**United States Penitentiary, Lewisburg, Pennsylvania**
As associate warden for the Operations Division (AW-O) at USP Lewisburg, I was responsible for the supervision and direction of all department heads in the division, which included the disciplines of Health Service, Facilities, Financial Management, Information Technology, Human Resources, Employee Development, and Food Service. Lewisburg is a high security level facility which employees approximately 475 staff and houses approximately 1,800 inmates. I frequently served as the acting warden.

**Associate Warden (1997-1999)**
**Federal Correctional Institution, Lompoc, California**
As associate warden for the Programs Division (AW-P), I was responsible for the
supervision and direction of all department heads in the division, which included two
Unit Managers, Case Management Coordinator, Chief Psychologist, Inmate Systems
Manager, Supervisor of Education, Supervisory Chaplain, and the Captain. I frequently
served as the acting warden.

**Executive Assistant to the Warden (1995-1997)**
**Federal Correctional Institution, McKean, Pennsylvania**
As the executive assistant to the warden, I was the facility's public information officer,
therefore responsible for all interactions with media sources. I was responsible for
conducting training, preparing correspondence for the warden's signature, engaging in
public relations speaking engagements, conducting surveys, and maintaining the facility's
policies. I conducted dozens of administrative staff investigations relevant to allegations
of staff misconduct, including sexual harassment, introduction of contraband, and other
violations of the agency's Code of Conduct. In each case my findings were presented to
the warden and the agency's Office of Internal Affairs.

**Unit Manager (1993-1995)**
**Federal Correctional Institution, McKean, Pennsylvania**
As a unit manager, I was responsible for managing, directing, guiding, and supervising
four case managers, two correctional counselors, two secretaries, and 2-4 correctional
officers who were assigned to my unit. I was responsible for one of the four housing units
in the facility, and therefore accountable for the unit's sanitation, maintenance, discipline,
and orderly operation. I served as the chairperson of the unit team, which was responsible
for the record keeping and custody classification of approximately 300 inmates assigned
to the unit.

**Management Analyst (1991-1993)**
**Federal Correctional Institution, McKean, Pennsylvania**
As management analyst for the facility, I was responsible for all inmate and staff
statistical data/records and "key indicators" used by the facility's executive staff. I
identified and tracked events such as inmate suicide attempts, staff misconduct, inmate
incident reports, rates and types of inmate violence, positive drug tests, escape attempts,
administrative remedy issues, etc., for the purpose of identifying trends and predicting
future outcomes.

**Case Manager (1989-1991)**
**Federal Correctional Institution, McKean, Pennsylvania**
I was responsible for a caseload of 175-300 inmates, which included researching,
monitoring, and adjusting individual security and custody classification scores; informing
inmates of their projected release date, notifying inmates of their next scheduled program
review, and the status of payment against their fines. I also managed issues relevant to
parole and probation and maintained meticulous records, assembled in each inmate's
central file.

**Safety Specialist Intern (1989)**
**Federal Correctional Institution, Morgantown, West Virginia**
As a safety specialist intern, I was responsible for all aspects relevant to safety
throughout the facility, including but not limited to conducting safety training for inmates

and staff, maintaining and inspecting bin-cards, inspecting Material Safety Data Sheets,
distributing and tracking potentially dangerous chemicals, conducting safety and
sanitation inspections, etc.

<u>**Employment Prior to 1989:**</u>

**Instructor of Criminal Justice (1987-1989)**
**Fairmont State College, Fairmont, West Virginia**
In this full-time tenure-track capacity, I taught Police Operations, Criminal Investigation,
Group Counseling Techniques, Introduction to Criminal Justice, and a multitude of
upper-level undergraduate criminal justice courses. I also served as the academic advisor
to approximately 100 criminal justice majors.

**Therapist (1987)**
**The Manchin Clinic, Farmington, West Virginia**
I conducted counseling and provided therapy to a variety of clients under the tutelage of a
licensed Ph.D. level psychologist. In this part-time capacity, I assigned DSM-III
diagnoses, developed treatment plans, maintained records, and generated billing forms.

**Police Officer (1984-1987)**
**Morgantown Police Department, Morgantown, West Virginia**
As a police officer for the Morgantown Police Department, I served in the patrol division,
the traffic division (as a motorcycle officer), as the department's community-relations
officer, and the detective division.

**Police Officer (1983-1984)**
Star City Police Department, Star City, West Virginia
As a Star City Police Officer, I conducted general patrol, investigated traffic accidents,
conducted criminal investigations, etc. While employed by the Town of Star City, I
attended and graduated from the 51st West Virginia State Police Basic Academy in
Institute, West Virginia, which is a 13-week, intensive residential program.

**Radio-Operator (1980-1983)**
**West Virginia State Police, Morgantown, West Virginia**
As a radio operator for the West Virginia State Police, I was detailed to the Morgantown
Detachment where I acted in a dispatcher-like role, communicating with state troopers in-
person and via radio. I fielded calls from the public, greeted community members in-
person, maintained logs, and entered reported stolen items into the National Crime
Information Center (NCIC) system.

<u>**Part-Time Teaching Positions (1988-2011):**</u>
The Pennsylvania State University, State College, PA
West Virginia University, Elkins and Jane Lew, West Virginia
University of Pittsburgh, Bradford, Pennsylvania
Jamestown Community College, Olean, New York
Chapman University, Vandenberg Air Force Base, Lompoc, California

## EDUCATION:

Master of Science Degree in Safety
West Virginia University
Morgantown, West Virginia

Master of Arts Degree in Counseling and Guidance
West Virginia University
Morgantown, West Virginia

Bachelor of Science Degree in Criminal Justice
Fairmont State College (now University)
Fairmont, West Virginia

## PUBLICATIONS and MEDIA RELATIONS:

I am the author of the book "*Triple Deuces: A Day in the Life of an American Correctional Worker".*

I have been interviewed by a multitude of media sources on a variety of corrections related issues. I have appeared in articles in most U.S. major newspapers, including but not limited to The Wall Street Journal, The Chicago Tribune, The Chicago Sun-Times, The Denver Post, Star Tribune, Pittsburgh Post-Gazette, The Item, The New York Times, New York Post, Los Angeles Times, etc.

I was interviewed by WBZ TV in Boston, and CNN in Pittsburgh, and assisted the NBC News Investigations Unit with respect to the murder of James "Whitey" Bulger.

## PROFESSIONAL ACCOMPLISHMENTS:

United States Government Top-Secret Security Clearance (2003-2009)

Trained and certified Hostage Negotiator by the Federal Bureau of Investigation

Trained and certified by the Federal Bureau of Investigation and Federal Bureau of Prisons in Crisis Management

Member of the United States Government Senior Executive Service (SES) 2005-2009

Graduate of the Federal Law Enforcement Training Center, Glynco, Georgia (voted class speaker by fellow graduates)

Graduate of the Aspen Institute's Justice in Society Program, Aspen, Colorado

Guest lecturer at John Jay School of Criminal Justice, New York, New York

Graduate of the Reid School of Interview and Interrogation Techniques

Nominee for Fairmont State College's 1987 Boram Award (most outstanding lecturer)

Past president of West Virginia University's Chapter of American Society of Safety Engineers

Graduate of the 13-week residential West Virginia State Police Basic Police Academy

Recipient of Special Recognition Award by the United States Department of Justice's Federal Bureau of Prisons for a life-saving act

Recipient of multiple United States Department of Justice Special Act and Sustained Superior Performance Awards

Member of Fraternal Order of Police since 1984

Recipient of Meritorious Service award from the Fraternal Order of Police

Member of the American Correctional Association

Lifetime Member of West Virginia University Alumni Association

Former Member of Pennsylvania County Wardens Association



**Cameron Lindsay Consulting Services, LLC**
**(EIN 81-4864799)**

1313 Jacobs Drive, Morgantown, West Virginia 26505
cklindsay.com
clindsay50@yahoo.com
(267) 252-4965

The attached report represents the opinions of corrections expert Cameron K. Lindsay in the matter of *Yazzie v. The United States of America*, Case No: 1:19-cv-00518, submitted to the attorney for the Plaintiff, Forrest Buffington.

All opinions are rendered to a reasonable degree of professional certainty. I reserve the right to modify, alter, and change said opinions as new facts and/or other materials become available via discovery.

## Credentials:

I have spent virtually all of my adult life working in the field of criminal justice. Beginning at the age of 20, I was a state police dispatcher for three years while attending undergraduate school; then a police officer for approximately five years; taught criminal justice at six institutions of higher learning; and worked as a correctional practitioner for 25 years, retiring in August 2014.

During this 25-year period of working in corrections, I served 20 years with the United States Department of Justice's Federal Bureau of Prisons (BOP). Throughout my federal career I was assigned to seven different correctional facilities in a variety of positions of increasing responsibility, including two appointments as associate warden, two appointments as acting warden, and three appointments as warden. I also served as the deputy regional director for the Bureau of Prisons' Northeast Regional Office in Philadelphia, Pennsylvania.

EXHIBIT C

My Bureau of Prisons warden assignments were at the Federal Correctional Institution, Lompoc, California (1,500 inmates and 180 staff); the United States Penitentiary, Canaan, Pennsylvania (1,700 inmates and 375 staff); and the Metropolitan Detention Center, Brooklyn, New York (2,000 inmates and 450 staff).

Subsequent to my retirement from government service in 2009, I worked in the private sector of corrections for five years, where I was the warden of the Moshannon Valley Correctional Center, Philipsburg, Pennsylvania (1,500 inmates and 240 staff); and the Delaware County Prison, Glen Mills, Pennsylvania (2,100 inmates and 575 staff).

In short, during my 25-year career as a correctional practitioner, I served as the warden of five separate facilities over the course of 12 years, including three prisons (two federal and one privatized federal) and two jails (one federal and one privatized county).

For two years prior to beginning my career in corrections, I was a full-time tenure-track instructor of criminal justice at a college; and throughout most of my career in corrections, taught criminal justice courses part-time at five other colleges and universities, including, most recently, The Pennsylvania State University.

At the time of my retirement from the federal government, I held a top-secret security clearance, and had been appointed by the United States Attorney General to membership into the United States Government's Senior Executive Service (SES).

I hold a Bachelor of Science degree in Criminal Justice from Fairmont State College (now University), a Master of Arts degree in Counseling, and a Master of Science degree in Safety, both from West Virginia University.

I am a graduate of the West Virginia State Police 51st Basic Academy in Institute, West Virginia; and the Federal Law Enforcement Training Center in Glynco, Georgia, where I was elected class speaker by my fellow graduates.

I have been designated by the U.S. Office of the Federal Public Defender as an expert on the Federal Bureau of Prisons.

I was contracted by the Kentucky Department of Protection and Advocacy for the purpose of reviewing and providing opinions relevant to the Kentucky Department of Corrections use of long-term segregation and use of physical (four and five point) restraints.

I am the author of the book, "*Triple Deuces*, A Day in the Life of an American Correctional Worker".

Since December 2014, I provided trial and/or deposition testimony as an expert in the following matters:

*Wells v. Rockcastle County Jail*, United States District Court for the Eastern District of Kentucky, Case No. 6:16-CU-00077-DCR;

*Forshey v. Huntingdon County, et al.,* Case No. 13-CV-00286, United States District Court for the Middle District of Pennsylvania;

*White v. Pallito*, United States District Court for Vermont, Case No. 174-3-15-WNCV;

*Morgal v. Jacobs*, *et al*.; United States District Court for Arizona, No. CV-12-280-TUC-CKJ;

*Manigault v. Ohio Department of Rehabilitation and Correction*, Court of Claims for Ohio, Case No. 2014-00962;

*Ricky Combs v. Three Forks Regional Jail, et al,* Lee Circuit Court, Commonwealth of Kentucky, civil action 15-C-100105;

*Hensley v. Bossio, et al*, United States District Court for the Eastern District of Kentucky, 0:17-CV-00007-HRW;

*Gabriel Armendariz, et al*, *v. Santa Fe County Board of Commissioners*, United States District Court for the District of New Mexico, 1:17-CV-00339;

*Paute v. Pulaski County, Kentucky, et al*; civil action 6:17-cv-00305-DCR; and,

*Sheldon Collier v. The State of Hawaii and John Does 1-5*, in the Circuit Court of the First Circuit, State of Hawaii, CV-17-01-0406-03-JHA;

## Materials Reviewed:

1. UNM Office of the Medical Examiner, Report of Findings, Case Number 2017-00219, in the matter of the death of Carlos Yazzie.

2. NNC 488. Public Intoxication, pages 711 and 712.

3. Consent Decree, in the District Court of the Navajo Nation, Window Rock, Arizona; Number: WR-CV-235-92.

4. Federal Bureau of Prisons Clinical Guidance manual for Detoxification of Chemically Dependent Inmates, February 2014.

5. NMS Toxicology Report in the matter of Carlos Yazzie.

6. Death Certificate for Carlos Tom Yazzie, DOB: April 3, 1972.

7. Complaint, in the matter of Yazzie v. USA.

## Incident:

1. Mr. Carlos Yazzie (Mr. Yazzie), age 44, was arrested by law enforcement officers of the Navajo Nation Police Department on January 11, 2017, at approximately 0115 hours, and charged with Public Intoxication.

2. At the time of his arrest, Mr. Yazzie was acutely intoxicated. Rather than providing or seeking medical treatment for Mr. Yazzie, he was transported directly to a detention facility operated by the Navajo Nation Department of Corrections (NNDOC), the Shiprock Jail.

3.  At the time Mr. Yazzie was placed in cell, he was "intoxicated and argumentative." It was also noted in discovery material that Mr. Yazzie was very obese.

4.  Mr. Yazzie was single-celled, meaning that he was celled alone and without a cellmate during the entire duration of his brief period of detention.

5.  Mr. Yazzie was left unmonitored in his cell until he was found unresponsive and lying on his left side, at 0715 hours on January 11, 2017.

6.  In short, Mr. Yazzie was placed in the cell, alone and intoxicated, and left totally unmonitored by staff for a period of some six hours.

7.  Attempts to resuscitate Mr. Yazzie proved unsuccessful, and he was subsequently declared dead by medics at 0738 hours.

8.  An autopsy, conducted by the UNM Office of the Medical Investigator, revealed that Mr. Yazzie's blood alcohol content was 0.361.

9.  According to the forensic pathologist who prepared the summary and medical opinion in Mr. Yazzie's death, "This level in and of itself has the potential to be lethal, even in a person who is a chronic ethanol user and has developed tolerance over time."

10.   The pathologist continued, "Additionally, given that this level was identified in a sample taken at least six hours after he last ingested ethanol, his blood alcohol level would have been *significantly higher* at the time of his incarceration."

11.   "Very high levels of ethanol can shut down critical areas of the brain that control breathing, heart rate, and body temperature, resulting in death."

12.   The pathologist listed cause of death in the matter of Carlos Yazzie as "Acute ethanol toxicity."

**<u>Opinions:</u>**

1. Correctional entities have a moral, ethical, professional, *and constitutional* responsibility to ensure the control, custody, *and care*, of all inmates under their charge.

2. Every organization, especially one charged with the basic care of human beings such as a correctional facility, is obligated to ensure basic standards for the safety and well being of every inmate under their custody.

3. Regardless of how one personally feels about inmates, the fact remains that inmates are incarcerated *as* punishment, not *for* punishment.

4. Correctional entities are constitutionally mandated to uphold our system of justice by providing an environment that is neither cruel nor unusual, and where due process is followed.

5. In the matter of Mr. Yazzie, staff of the detention center where he was being detained failed to recognize or take appropriate action to lessen or minimize the inherent dangers of alcohol poisoning.

6. In November 1992, the District Court of the Navajo Nation, Window Rock, Arizona, issued a Consent Decree (WR-CV-235-92).

7. The Statement of General Intent of this particular Consent Decree stipulates, "The goal of this consent decree is ensure that all people housed in the Navajo Detentions Facilities are detained under humane conditions."

8. Admitting an obviously intoxicated person into a correctional facility prior to being medically examined and cleared, runs totally counter to accepted policy, procedure, and practice, in the profession of corrections.

9. Moreover, failing to render proper medical assistance to an individual who is obviously intoxicated, celled alone, then failing

to check on that individual for hours, falls well short of creating "humane conditions."

10.   The aforementioned consent decree further stipulates (page 8): "A uniform written plan must be implemented regarding...routine health care matters by December 1, 1993."

11.   It further states, "At a minimum this plan should include standards on (10.) Detoxification Procedures."

12.   This point demonstrates that as early as 1992, the Court recognized that the implementation of detoxification procedures for the Navajo Nation detention facilities was essential in order to create "humane conditions" within.

13.   The consent decree standards are generally identical to nationally=adopted standards, including the Federal Bureau of Prisons, the National Commission on Corrections Health Care, and the American Correctional Association, which will be further elaborated on herein.

14.   It does not appear that the duties of the Navajo Nation or the United States in contracting for the provision of jail services differs from that standard constitutionally mandated, with fundamentally identical prohibitions of cruel and unusual punishment appearing in both the Indian Civil Rights Act and the Navajo Nation Bill of Rights.

15.   The following standards require initial screening and assessment of inmates for medical conditions, including those occasioned by alcohol intoxication.

16.   It is known that violation of these standards may result in death of inmates. It appears that the death of Carlos Yazzie occurred as a direct result, and predictable result, of the violation of these standards.

17.   In February 2014, approximately three years before Mr. Yazzie died in a Navajo Nation jail, the United States Department of

Justice's Federal Bureau of Prisons provided clinical guidance to the field in the form of a manual titled, "Detoxification of Chemically Dependent Inmates (DCDI)".

18. The bureau's DCDI states, "The safe and effective treatment of withdrawal syndromes requires that clinicians be alert to the possibility of substance dependence *in all new inmate arrivals at their institutions.*"

19. It further states, " Substances that produce dangerous withdrawal symptoms for individuals with physiological dependence include alcohol…"

20. With respect to "short-stay inmates" the manual states, "Alcohol detoxification is a necessity for all inmates who present with alcohol dependence or withdrawal."

21. With respect to alcohol withdrawal specifically, section 6 of the DCDI, titled Alcohol Withdrawal, under the heading of Screening, it states, "…all incoming inmates should be screened for a history of alcohol use."

22. "Inmates presenting with alcohol intoxication should be presumed to have alcohol use disorder until proven otherwise."

23. In the profession of corrections, which includes the management and operations of jails, prisons, and detention facilities, there is a professional organization known as the American Correctional Association (ACA).

24. The ACA is concerned with the common goal of improving our systems of justice, and the specific goal of quantifying and qualifying basic professional standards for the improvement of correctional facilities.

25. According to ACA's Core Jail Standards, First Edition, 2010, it states, "With this manual, the nation gains a comprehensive set of *minimal jail standards.*"

26.  Similar in concept and design to the aforementioned Consent Decree, these basic standards "will enable jails of all sizes to improve operational effectiveness…and make our country's jails more safe for the community, staff, and inmates."

27.  Correctional agencies seeking to operate their facility in a safe, secure, and professional manner, are engaged with acquiring ACA accreditation.

28.  Unfortunately, most correctional agencies, such as the NNDOC, do not require their jails and prisons to be ACA accredited. The consequence, quite predictably, is systemic dysfunction, such as what is witnessed at the Shiprock Jail in the matter of Mr. Yazzie.

29.  According to ACA's Core Jail Standards, 1st Edition 2010, the first goal is "Safety." It states, "Provide a safe environment for the community, staff, volunteers, contractors, and inmates."

30.  The detention center failed to provide a safe environment by failing to recognize the well-established and inherent dangers of acute alcohol poisoning, and seek medical assistance for Mr. Yazzie.

31.  Given the fact that Mr. Yazzie was highly intoxicated at the time of his arrest and admittance into the Navajo Nation correctional facility, he should have instead been immediately taken to the nearest medical facility.

32.  In addition to the American Correctional Association, there is another entity dedicated to improving the profession of corrections, and that is the National Commission on Correctional Health Care (NCCHC).

33.  The NCCHC "is dedicated to improving the quality of correctional health services and helping correctional facilities provide effective and efficient care."

34.  The NCCHC began at the American Medical Association in the 1970s. "This manual (2014) represents a revision of standards first published in 1976…"

35.  The standards NCCHC sets forth are recommended for "proper management of a correctional health services delivery system."

36.  NCCHC Standard J-A-01, Access to Care, states, "Inmates have access to care to meet their serious health needs." In the matter of Mr. Yazzie, his serious health need was not met, which led to his death.

37.  NCCHC Standard J-C-07, Staffing, states, "A sufficient number of health staff…provide inmates with adequate and…timely treatment…" Staff of the Shiprock Jail failed to provide medical assistance of any type to Mr. Yazzie.

38.  NCCHC Standard J-G-07, Intoxication and Withdrawal, stipulates, "protocols for intoxication…individuals are monitored and housed in a safe location *that allows for effective monitoring."*

39.  The same standard goes on to state, "Inmates experiencing severe or progressive intoxication *are transferred immediately to a licensed acute care facility."*

40.  The same standard continues, "Individuals showing signs of intoxication or withdrawal are monitored by qualified health care professionals…until symptoms have resolved."

41.  NCCHC Standard J-C-04, Health Training For Correctional Officer, stipulates, "Correctional officers who work with inmates receive health-related training at least every 2 years. The training includes, at a minimum, c. Recognizing acute manifestations of intoxication…"

42.  "An outline of the training including course content is kept on file." And, "…evidence of attendance is kept on site for each employee."

43. NCCHC Standard J-G-06, Patients With Alcohol And Other Drug Problems, states, "The intent of this standard is that a patient's addictions are identified and properly managed."

44. This standard further indicates, "Correctional staff are trained in recognizing alcohol and other drug problems in inmates." There is no evidence that correctional staff at the Shiprock Jail received training relevant to acute intoxication and the proper care of inmates who are in this state.

45. NCCHC Standard J-A-10, Procedure In The Event Of An Inmate Death, states, "All deaths are reviewed to determine the appropriateness of clinical care; to ascertain whether changes to polices, procedures, or practices are warranted; and to identify issues that require further study."

46. There is nothing in the case materials indicating that either an administrative review and/or clinical mortality review took place. As the standard states, "The intent of the standard is that preventable deaths are avoided."

47. Yet, as I have found common when inmates die in American correctional facilities, very few people care, let alone want to learn from the experience, in order to prevent recurrence.

48. Based on my education, training, and 30 years of experience working in corrections, it is therefore my professional opinion that the Defendants in this matter acted in a manner that was grossly negligent, indifferent, and inconsistent with nationally accepted basic correctional practices in their care and treatment of Mr. Yazzie. (End Report)

I have been compensated at $275 per hour for all expert services in this matter.

Cameron K. Lindsay /S/_____
December 30, 2019

11